# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
    **Plaintiff,**

  v.                                            **Case No. 09-CR-118**

**MICHAEL PEMBROKE**
    **Defendant.**

## SENTENCING MEMORANDUM

Defendant Michael Pembroke pleaded guilty to wire fraud, contrary to 18 U.S.C. § 1343, and money laundering, contrary to 18 U.S.C. § 1956, arising out of his participation in a mortgage fraud scheme devised by his co-defendant, Paul Zaleski. Zaleski, a mortgage broker, and defendant, a contractor, created a partnership to acquire, remodel, and resell residential properties for profit. Neither man had the assets to sufficiently fund the venture, so Zaleski, through the use of inflated appraisals, fraudulent loan applications, and straw purchasers, generated necessary funds from loan proceeds. He did so by targeting "motivated" sellers and offering them more than their asking price, with the condition that the difference between the asking price and the actual contract price be remitted to a shell company he and defendant controlled; lenders were kept in the dark about this arrangement, and Zaleski and defendant then used these so-called "sellers credits" to make mortgage payments on existing properties, to purchase construction materials, and, at times, for personal expenses. During the course of his involvement, defendant and his wife purchased nine properties, and Zaleski (personally and through the use of straw buyers) several more. The scheme eventually collapsed, and most of the properties went into foreclosure.

Following defendant's guilty pleas, I ordered a pre-sentence report ("PSR") and set the case for sentencing. In imposing sentence, the district court must first calculate the advisory guideline range, then determine the sentence based on all of the factors set forth in 18 U.S.C. § 3553(a). See United States v. Panice, 598 F.3d 426, 441 (7th Cir. 2010); United States v. Bush, 523 F.3d 727, 729 (7th Cir. 2008).

## I.  GUIDELINES

### A. The PSR's Guideline Calculations

On the wire fraud count, defendant's pre-sentence report ("PSR") set a base offense level of 7 under U.S.S.G. § 2B1.1(a)(1), then added 16 levels based on a loss amount of $1,896,405, § 2B1.1(b)(1)(I), representing the total amount of the loans on the nine properties defendant and his wife purchased as part of the scheme, for an adjusted level of 23. On the money laundering count, the PSR adopted a base level of 23 under U.S.S.G. § 2S1.1(a)(1), then added 2 levels under § 2S1.1(b)(2)(B) because defendant was convicted under 18 U.S.C. § 1956. The PSR grouped the two counts under U.S.S.G. § 3D1.2, then subtracted 3 levels for acceptance of responsibility, for a total offense level of 22.

Regarding defendant's criminal history, the PSR assessed 2 points for a November 22, 1994 battery sentence (9 months in jail on revocation of probation); 2 points for a November 20, 1995 disorderly conduct sentence (90 days jail on revocation of probation); 2 points for an August 2, 1996 marijuana possession sentence (60 days jail); 2 points for a November 14, 2001 drunk driving sentence (60 days jail); and 1 point for an August 26, 2003 drunk driving sentence (fine); for a total of 9 points and a criminal history category of IV. The intersection of level 22 and category IV produced an imprisonment range of 63-78 months.

**B.    Defendant's Objections**

Defendant objected to the loss amount under U.S.S.G. § 2B1.1(b)(1), requested a mitigating role reduction under U.S.S.G. § 3B1.2, and argued that criminal history category IV overstated his record.

**1.    Loss**

Defendant argued that not all of the loan applications for properties he purchased misrepresented his and his wife's income and assets, and that some of the applications purporting to bear their signatures were forged, specifically the applications for the properties at 26806 Orchard, Antioch, IL, and 104 Chapel, Twin Lakes, WI. Defendant further claimed that he did not understand that he lacked the financial resources to qualify for the loans obtained. He further disputed that he made the purchases in a short time frame so that lenders could not reject him as over-extended; Zaleski arranged the loans, and the real estate market at the time afforded investors quick turnaround on their investments. Finally, he noted that while it was true that Zaleski divested himself of the properties and stopped paying mortgages, he (defendant) continued to work and rehabilitate the properties and did not stop paying his mortgages until financially unable to continue.

Based on these factual disputes, defendant argued that he did not cause $1,896,405 in false loans to be created for the purchase of nine properties. He admitted to signing a false application for the charged property in Salem, Wisconsin but argued that he should not be held responsible for the entire amount. He had no participation in many of the named properties; in others he did rehab work but was not involved in the purchase, appraisals, or loans. He conceded that he was responsible for the loan on one property, for which the government put

3

the actual loss at $24,655.

The government responded to these factual disputes, indicating that all of the preliminary and final 1003 Uniform Residential Loan Application forms for the nine properties purchased by the Pembrokes misrepresented their employment and income information. Additionally, in each case, the final 1003 form was signed at closing by Linda Pembroke, Michael Pembroke, or both. Copies of their driver's licenses also appeared in the loan files, confirming that they appeared at closing, and their signatures appeared on closing documents for the various loans. The government attached to its objection response copies of defendant's nine final 1003 forms along with a copy of their driver's licenses. The government indicated that a review of these forms showed that, contrary to defendant's objection, all nine of the loan applications falsely represented material information about their employment and income. Specifically, the documents alleged income from $62,400 to $96,00 per year for Linda, and combined income of $110,000 to $168,00, while tax records showed much lower incomes. For instance, in 2004 Linda earned less than $30,000 as a factory worker. In addition to the false employment and income information, the loan applications falsely represented that the properties generated rental income in excess of the mortgage payments. While the government conceded that Zaleski or his step-son Robert Farrell actually prepared the applications, every loan application prepared for and signed by the Pembrokes contained materially false information.

The government further argued that it was disingenuous for defendant to claim that he believed he and his wife had the resources to qualify for the loans, given their modest income. Defendant also previously admitted to agents that he had no intention of paying the mortgages with his own funds but rather would rely on the sellers credits. The claim about the time frame

4

also came from a previous statement defendant made during an interview with law enforcement. Specifically, in an April 16, 2008 statement, defendant mentioned the need for the loans to go through quickly so subsequent lenders would not learn of the previous purchases; they took advantage of the credit bureaus delay in posting mortgages on his credit report. The government did not know precisely when defendant stopped paying and working on the houses, but eventually all but one went into foreclosure.

On review of the submissions and the attachments, I agreed with the government on these factual disputes. The attached documents confirmed the government's version.

However, as the government recognized, the loss calculation method used by the PSR was erroneous. The PSR used the total amount of the loans on the nine properties, without any offsets under U.S.S.G. § 2B1.1 cmt. n.3(E). As the Seventh Circuit recently reiterated in United States v. Green, 648 F.3d 569, 584 (7th Cir. 2011), in these types of cases the district court will ordinarily determine the loss amount by subtracting the sale price the lender received after it recovered possession of the property from the amount of its original loan. The PSR referred to its figure as the intended loss amount. While it is true that the court generally uses the higher of actual or intended loss, U.S.S.G. § 2B1.1 cmt. n.3(A), I saw no evidence in this case – and the government did not contend – that defendant or Zaleski intended to pocket all of the proceeds and somehow deprive the lenders of any payments or any ability to recoup losses through foreclosure proceedings. To the contrary, the government stated that it believed defendant did intend to repay the loans with proceeds he and Zaleski obtained upon eventual resale of the improved properties.

The government reached the same offense level through a different method – using the actual loss that resulted from the loans for which defendant was responsible under relevant

conduct rules. The government argued that this included not only the loans processed in defendant's name but also additional loans procured in the names of Patricia Kay, Simon Quintero, William Struve, and William Koprovic from which sellers credits were deposited into the shell company account defendant controlled and used. The government did not seek to hold defendant responsible for the losses of the entire scheme, specifically omitting certain properties, or any of the properties after he and Zaleski ended their partnership.

The government compiled a list of the properties for which it held defendant responsible, set forth on pages eight and nine of the PSR addendum, for a total loss of close to $1-½ million. The government indicated that defendant was aware of the nature of the scheme and should be held accountable for the full scope of the losses resulting from it during the time of his participation under U.S.S.G. § 1B1.3(a)(1)(B).

Defendant contested the attribution of additional properties to him, but he made no specific argument that they fell outside of the reasonably foreseeable, jointly undertaken criminal activity. Ultimately, he conceded that his arguments on this issue tended more towards § 3553(a). I agreed, found the government's theory correct, and adopted the loss figure in the PSR addendum.

### 2. Mitigating Role

Defendant next argued for a 4 level reduction under U.S.S.G. § 3B1.2. Under that guideline, the court may reduce the offense level by 4 if the defendant was a "minimal participant," by 2 if he was a "minor participant," and by 3 in cases falling in between. The guideline thus provides a range of adjustments for a defendant who plays a part in committing the offense that makes him "substantially less culpable than the average participant." U.S.S.G. § 3B1.2 cmt. n.3(A). The minimal participant adjustment covers defendants who are plainly

among the least culpable of those involved in the conduct of a group.  Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant.  U.S.S.G. § 3B1.2 cmt. n.4.  The minor participant reduction applies to a defendant who is less culpable than most other participants, but whose role could not be described as minimal.  U.S.S.G. § 3B1.2 cmt. n.5.  The defendant bears the burden of demonstrating, by a preponderance of the evidence, that he is entitled to a role reduction.  See United States v. Haynes, 582 F.3d 686, 709 (7th Cir. 2009), cert. denied, 131 S Ct. 634 (2010); United States v. Corral, 324 F.3d 866, 874 (7th Cir. 2003).

Defendant claimed that he lacked an understanding of the scope and structure of the enterprise and of the activities of the others.  He argued that his illegal activity consisted of signing loan applications that contained false information, applications prepared by Zaleski.  He was the buyer on some, not all, of the properties.  Some of his applications contained accurate information, and some were not actually signed by him or his wife.  During the time of the real estate boom, defendant claimed, it was common practice to falsify income and other information. He indicated that he used the money to rehabilitate the properties as intended and paid all the mortgages on his properties until he was broke.  He further claimed that Zaleski and Patricia Kay, another participant, defrauded him regarding Illinois properties defendant bought by transferring titles to the "Wayne Hubbard Trust" for their use.

I found that defendant did not qualify for an adjustment under U.S.S.G. § 3B1.2.  First, defendant primarily compared himself to Zaleski, but in considering a possible adjustment under this guideline the court compares the defendant to the average participant, not the leader.  See United States v. Gallardo, 497 F.3d 727, 741 (7th Cir. 2007).  Defendant made

7

no effort to identify the average participant or to show how he was substantially less culpable.

Second, defendant under-estimated his involvement somewhat. He purchased nine properties it was clear he could not afford, and he controlled the first shell company bank account into which the sellers credits were collected and from which they were spent. As defendant admitted in an April 16, 2008 statement to agents, when sellers credits were paid to the shell company, he withheld $2000 in the form of cash, which he split with Zaleski. He spent some of the money in casinos. In that statement, defendant also admitted that sellers credits were used to make mortgage payments on his home and investment properties, pay personal expenses such as his cable bill, and pay for labor and materials used to improve the homes purchased with Zaleski. Towards the end of 2004 or beginning of 2005, defendant's accountant told him he should not pay personal bills directly from his business accounts in lieu of paychecks. Consequently, he established a second account, which he used to pay mortgages, taxes, and insurance for the houses he bought with Zaleski. The account was funded solely with sellers credits. He also maintained a second account in the name of his company, Dayco, which he used to pay his personal expenses; the Dayco account was funded by sellers credits as well as payments for other remodeling work he did.

Defendant was less culpable than Zaleski, but I could not find him substantially less culpable than others, including Kay, the only other person he mentioned. Kay pleaded guilty to misprision of a felony, and the evidence showed that she originally became involved in this scheme as an investor, not a criminal participant. She also lost large amounts based on her involvement.

### 3. Criminal History

Finally, defendant submitted that the criminal history points, while accurately calculated

8

in the PSR, overstated his true criminal history. I considered this argument under § 3553(a). Depending on when the instant offense began in 2004, it could perhaps be argued that the sentence in PSR ¶ 58, initially imposed on November 22, 1994, was too old to score, but even without these 2 points defendant still fell in criminal history category IV. In any event, it appeared that the instant offense started in, at least, October 2004, and so this sentence would score.

I therefore adopted a guideline range of 63-78 months imprisonment, 1-3 years supervised release under U.S.S.G. § 5D1.2 (2011), and $7500 to $750,000 fine

## II.  SECTION 3553(a)

### A.  Sentencing Factors

Section 3553(a) directs the court, in determining the particular sentence to be imposed, to consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the [advisory] sentencing [guideline] range[;]
>
> (5) any pertinent policy statement . . . issued by the Sentencing Commission[;]
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

9

18 U.S.C. § 3553(a).

After considering these factors, the court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." Id. The guideline range serves as the starting point and initial benchmark in making this determination, Gall v. United States, 552 U.S. 38, 49 (2007), but the district court may not presume that a guideline sentence is the correct one, Nelson v. United States, 129 S. Ct. 890, 892 (2009), and remains free to impose sentence within statutory limits based on appropriate consideration of all of the factors listed in § 3553(a), Pepper v. United States, 131 S. Ct. 1229, 1241 (2011).

**B. Analysis**

    **1. The Offense**

As indicated above, this prosecution arose out of a mortgage fraud scheme devised by Paul Zaleski. In 2004, Zaleski, who operated a mortgage brokerage business, devised a plan to buy and resell residential properties for profit. Defendant, Zaleski's neighbor, operated a construction and remodeling business, and Zaleski suggested that they become partners in this endeavor. Under the plan, Zaleski would arrange loans to acquire the properties, and defendant would do the remodeling work. However, neither man had the resources to make necessary payments on the properties they targeted for purchase, so Zaleski devised a scheme to generate funds. The scheme involved creating "sellers credits" derived from loan proceeds, which were deposited into the bank account of "Silver Creek Investments," a shell company Zaleski and defendant created.

To create the credits, Zaleski targeted so-called motivated sellers, that is, people whose

properties had been on the market for awhile, and offered them more than their asking price, with the condition that the difference between the asking price and the actual contract price be remitted to Silver Creek. The sellers were told that the credits were going to be used by the buyers to improve the properties. While the sellers credits were generally memorialized in an addendum to the sales contract, they were not included in the loan applications Zaleski forwarded to potential lenders. As a result, lenders were not told that the contract price was not the actual selling price. The sellers credits did appear on the HUD-1 settlement statements at closing, causing the settlement companies to disburse a portion of the loan funds to Silver Creek.

To further effectuate the scheme, Zaleski enlisted John Hochrek, a real estate agent and appraiser, to help Zaleski and defendant locate properties that could be remodeled and resold, and Hochrek negotiated the details of the sales contracts including the increased contract price, which would create the sellers credit Zaleski required. Hochrek understood that the sellers credits would be disbursed to Silver Creek and later to other shell companies Zaleski created ("Lakeside Property Management" and "Northpointe Development"). Hochrek further understood that Zaleski wanted him to appraise the properties at the contract prices rather than the owner's true asking price, even though the asking price more fairly represented the actual value. Between October 2004 and August 2006, Hochrek helped Zaleski locate and purchase about fifteen properties, and he completed at least thirty-seven appraisals at Zaleski's request, each time valuing the property at the contract price rather than the owner's asking price. For these transactions, he received real estate commissions if he was involved as the realtor and appraisal fees if he was involved as the appraiser. The sales contracts and appraisals then became part of fraudulent loan application packages created by Zaleski and resulted in the

11

funding of loans through interstate wire transactions.

Between October 2004 and February 2005, defendant purchased a total of nine properties with loan applications prepared by Zaleski. With one exception, the applications failed to disclose the sellers credit arrangements, and each application included an appraisal inflating the actual value of the property. In addition, the applications misrepresented the income and assets of defendant and his wife, as discussed above. Defendant lacked the financial resources to qualify for the mortgage loans he obtained, and his loan applications contained false information about his qualifications. His nine purchases occurred within a tight time frame so that potential lenders would not reject him for an unacceptably high debt-to-income ratio. Some of the applications also included false documents, such as rental agreements for tenants that did not exist. In reliance on the information in the applications, lenders advanced nearly $1.9 million in loan funds for defendant's purchase of the nine properties. From these loan funds, $313,300 was disbursed to Silver Creek. Zaleski and defendant used some of that money to purchase other properties, giving rise to several of the money laundering counts alleged in the indictment. Defendant also used the funds to make mortgage payments on the existing properties and to purchase construction materials. He transferred some of these funds to his construction company account, disbursed funds to Zaleski and others, and withdrew money in cash, sometimes from casino ATMs.

Between February 2005 and September 2005, Zaleski also arranged for the purchase of thirteen additional properties in the names of six other borrowers who were essentially straw purchasers. He solicited the participation of these borrowers by telling them that they would become members of an investment group consisting of individuals who were pooling their money to buy, refurbish, and resell real estate. These investors were told that they would not

12

have to contribute any actual money to the venture but rather would be contributing their "good credit," and that as a result of participating they would receive profits when the properties were sold. In fact, all of these additional borrowers were contributing only their good credit, and the only actual funds that were part of the investment venture were those generated by the sellers credits. Like the applications Zaleski prepared for defendant, the applications he prepared for these additional borrowers also contained false information about income, assets, and other qualifiers. These applications generated loan funds of more than $3.7 million, from which close to $600,000 was disbursed to Silver Creek and about $500,000 to Lakeside Property Management, the second shell company, which Zaleski created in June 2005. In the late summer or early fall of 2005, defendant and Zaleski dissolved their partnership, and Zaleski continued the fraud without defendant's further participation.

As a result of the fraudulent applications that were submitted during the course of this scheme, numerous lenders, identified in ¶ 32 of the PSR, funded loans for the purchase of various properties, wiring money interstate. In total, there were fifty-three transactions involving forty-six properties, generating about $14 million in loans from which about $2 million in sellers credits were disbursed to Silver Creek, Lakeside, and Northpointe.

The scheme collapsed in September 2006, due to a combination of decline in the housing market and Zaleski's inability to convince additional buyers to become involved. Zaleski stopped paying the mortgages and told the individual borrowers, who did not think they had any personal obligation, that they were on their own. Few of the properties were resold to bona fide buyers. The majority of the loans went into default and the properties into foreclosure, causing substantial losses to the entities that acquired the mortgage notes and credit issues for the various borrowers solicited as investers in the venture. Hochrek received

his normal realtor and appraisal fees for the transactions he was involved with; Zaleski and defendant took money from the sellers credits, but the exact amount they took was unknown.

In his version of the offense to probation, defendant acknowledged that he signed false loan applications. He stated that he intended to improve and resell the properties, not to causes losses to lenders or investors. He stated that he made no money through these real estate deals, and that the total personal money he took from the sales was $4000. Most of the payments to him from Silver Creek were for materials, labor, and sub-contractors related to work he did on the houses. Defendant stated that it was not his intent to default; rather, he did everything he could to fix up the properties, pay the mortgages as long as he was able, and to try to sell rather than go into foreclosure. He further indicated that after it became clear to him what Zaleski was doing, he contacted the FBI, Lake County Sheriff, and an attorney. He also filed a lawsuit against Zaleski and Kay, receiving a judgment for $148,450.

### 2. The Defendant

Defendant was forty-seven years old, with a number of prior convictions, as set forth in § I.A. above. As defendant's record suggested, and ¶ 87 of the PSR confirmed, substance abuse had been an issue, mainly alcohol, but also marijuana (for which defendant tested positive on May 15, 2009, the day of his arraignment in this case). The earlier battery and disorderly cases involved domestic violence and also appeared to have been substance abuse related.

Defendant married in 1984, and he and his wife had their problems, as he admitted and as his record confirmed. His wife seemed positive now, both in her statement to the PSR writer and at the sentencing hearing, describing him as big-hearted and an asset to the community. She noted that he stopped or at least tempered his drinking several years ago, and his temper

14

was not as problematic since. He tested negative for controlled substances since June 2009.

Defendant's wife had recently gone back to school, a decision defendant supported, but she was unable to find work in her field. She doubted her ability to maintain the home mortgage without his income. She described him as a family oriented person who loved her and their three children, ages twenty-seven, twenty-four, and twenty; the younger two still lived at home.

For the past twenty years, defendant operated his remodeling and construction business in Twin Lakes, Wisconsin. I received numerous letters about the good defendant did with his business and the manner in which he helped others, and his supporters said the same at the sentencing hearing, all to his credit.

### 3. The Sentence

The guidelines called for 63-78 months, and I agreed that some imprisonment was needed to provide just punishment, promote respect for the law, and deter others from engaging in similar conduct. A probationary sentence, as defendant suggested, would unduly depreciate the seriousness of the offense. As I noted in sentencing co-defendants in this case, mortgage fraud schemes of this sort cause harm not just to the lenders but also to the communities in which the involved properties sit, generating more foreclosures.

Defendant compared himself to Hochrek, whom I sentenced to 6 months prison and 6 months home confinement, arguing that Hochrek's conduct was worse. I found it somewhat difficult to compare defendant and Hochrek, as they occupied different – but equally important – roles in the scheme. As discussed above, Hochrek located properties and completed false appraisals for Zaleski. Defendant claimed that, unlike him, Hochrek had no intention or concern about improving the properties for resale. However, Hochrek received only his normal

15

fees for his involvement, not any profit. Further, Hochrek had no prior record, unlike this defendant, who fell in category IV.

Defendant also compared himself to Patricia Kay. As noted, Kay pleaded to misprision of a felony, and she received a sentence of 3 years probation with 6 months home confinement, which was within her guideline range.[1] Defendant's range was obviously much higher, which constituted one big difference between them. Defendant noted that Kay, like him, signed loan documents that were false; she was also involved in Northpointe, another shell company with no actual business function. Defendant further claimed that Kay and Zaleski defrauded him by taking title to Illinois properties defendant had bought and was rehabbing. He argued that Kay's culpability was far greater than his, and she received probation. But the nature of Kay's initial involvement was different, as discussed; she started as an investor, and she ultimately lost a lot of money. Further, she, like Hochrek, had no prior record.

Defendant noted that a sentence served in the community would facilitate his payment of restitution and allow him to continue supporting his family. These were factors I could consider under §§ 3553(a)(1) & (7), but I did not agree that they supported a sentence with no period of confinement. First, as discussed, the seriousness of the offense demanded some confinement. Second, aside from a bare allegation, defendant presented no evidence that any period of confinement would make it so that his wife and children (all adults now), could not maintain the home mortgage. Third, I saw no reason why defendant could not resume his business upon completion of a prison sentence and then make restitution.

For these reasons, I declined to impose a sentence of probation. I did find a sentence

---

[1] Kay's imprisonment range was 6-12 months, a Zone B range permitting a sentence of probation with a condition of home or community confinement.

16

below the guideline range sufficient, however. Regarding the seriousness of the offense and the need to provide just punishment, I first noted that the loss figure somewhat overstated the seriousness of defendant's specific conduct. While defendant's gain from the sellers credits could not be definitively determined, it appeared modest.[2] Second, the money laundering aspect of the case did not really add all that much; the subject financial transactions were really part of the underlying scheme. Third, it seemed clear that Zaleski was the primary figure in this offense; he devised the scheme and prepared the false documents. I did not doubt that defendant intended to try to rehab and sell these properties for a profit and pay off the loans.

A below range sentence also sufficed to protect the public and deter. Given his age and demonstrated sobriety since 2003, I did not see defendant as posing a significant threat to the public at this point. His prior record was older, consisted entirely of misdemeanors, and was compiled during a time when he was drinking heavily. He avoided further brushes with the law since 2003. Category IV somewhat overstated his current risk.

Finally, it appeared that defendant tried to cooperate with the government. He submitted to various interviews with agents, which were attached to the addendum. This was something I could consider even in the absence of a U.S.S.G. § 5K1.1 motion from the government. He also complied with all conditions of bond, and I further took into account his history of helping others, particularly through his work.

Under all the circumstances, I found a split sentence consisting of 6 months prison followed by 6 months of home confinement sufficient but not greater than necessary. This sentence provided sufficient punishment and deterrence, while accounting for the mitigating

---

[2]Defendant put it at $4000.

17

factors discussed.  This sentence was based on § 3553(a) and would have been the same regardless of my findings on the guideline issues.

### III.  CONCLUSION

Therefore, I committed defendant to the custody of the Bureau of Prisons for 6 months on each count running concurrently.  Based on his financial situation and the anticipated restitution, I found that defendant lacked the ability to pay a fine and thus waived the fine. Upon release from prison, I ordered defendant to serve a supervised release term of 3 years. I selected the maximum term to ensure sobriety and to facilitate payment of restitution.  As a condition of supervised release, I required defendant to comply with the conditions of home confinement for a period not to exceed 180 consecutive days.  Other terms and conditions of the sentence appear in the judgment.

Dated at Milwaukee, Wisconsin, this 8th day of December, 2011.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge